NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE ESTATE OF HAROLD OSHINSKY, Individually, and On Behalf of a Class of Similarly Situated Persons,<br><br>Plaintiffs,<br><br>vs.<br><br>NEW YORK FOOTBALL GIANTS, INC., et. al.<br><br>Defendants. | Civil Action No.: 09-cv-01186 (PGS)<br><br>OPINION |

      This is a breach of contract action arising out of the New York Football Giants and New York Jets (collectively "Defendants") imposition of a personal seat license (PSL) contract in connection with the purchase of season tickets for the new Giants Stadium (the "New Stadium"). The PSL contract imposes an up-front fee on season ticket holders for the right to purchase season tickets; such a requirement was not previously imposed on season ticket holders. Following my prior decision in *Oshinsky v. New York Football Giants, Inc.*, No. 09-cv-1186, 2009 U.S. Dist. LEXIS 107608 (D.N.J. Nov. 17, 2009) ("*Oshinsky I*"), the major issue remaining in this case is whether the imposition of a PSL violated an implied contract, if any.[1] As noted in *Oshinsky I*, implied contracts may arise out of the conduct of the parties; thus, discovery was undertaken to review same.

---

[1] The facts set forth in *Oshinsky I* are incorporated herein.

1

The primary motion before the Court is a joint motion for summary judgment, submitted by Defendants the New York Football Giants, Inc. and Giant's Stadium LLC (collectively "Giants Defendants"), and Defendants New York Jets LLC and Jet's Stadium Development LLC (collectively "Jets Defendants").[2] Regrettably, during the pendency of this action, the named Plaintiff, Harold Oshinsky, died; therefore, the Estate of Harold Oshinsky (Estate) has stepped in to this action on behalf of those similarly situated (collectively "Plaintiffs") to oppose the Defendants' motion.[3]

## I.   BACKGROUND

### A.   Plaintiffs' Allegations of an Implied Contract for the Renewal of Season Ticket Subscriptions

In the summer of 2008, Defendants publicly announced that all season ticket holders' subscriptions would be terminated, unless the season ticket holder agreed to enter into a PSL contract

---

[2] At oral argument, the Giants Defendants argued that this was an "easy case" to decide, while the Jets' attorney intimated that season tickets were a thing of the past, like his season tickets to the opera, but the point lost by such remarks is that the Plaintiffs are fans of the Giants and Jets. As fans, they root for the teams with their heart and soul. Some fans will lose their tickets because they cannot afford the PSL fee, and it will undoubtedly affect their relationship with their team. Knowing that consequence, it is a difficult case to decide, and causes of the heart and soul, as opera fans know, are never a thing of the past. Nevertheless, the PSL must be decided on the law rather than on emotional attachments; but the Court will keep the fans in mind.

[3] Following the parties' submissions on the motion for summary judgment, Plaintiffs also filed a motion to strike parts of Defendants' responses to Plaintiffs' statement of additional facts and to deem certain facts to be undisputed. The Court will also address that motion in this Opinion. The Court reviewed the submissions by the parties and determines that the motion is granted. Therefore, to the extent practicable, the Court did not rely on Defendants' responses to Plaintiff's 56.1 statement of additional facts. Rather, the Court primarily relied on the affidavits and documents submitted by the parties in connection with the motion for summary judgment.

for each seat with Giants Stadium LLC and/or Jets Stadium Development LLC.  The Defendants' PSL contract sets forth that the season ticket holder acquires a personal seat license for as long as the teams play in the New Stadium and requires a payment of $1000 to $25,000 for each seat assigned to the season ticket holder.[4]  The Plaintiffs argue that their conduct, as well as the conduct of Defendants over the last thirty years, has conveyed irrevocable renewal rights to the Plaintiffs.  Hence, the termination of their season ticket subscription for failure to enter into the new PSL agreement breaches the contract that was established by the parties' prior conduct.

As previously mentioned, the named Plaintiff, Mr. Oshinsky, died in January 2010.  As a result, his Estate was substituted as Plaintiff on March 10, 2010. However, the co-executors of his Estate,[5] have stipulated that they "do not have any personal knowledge or information relevant to the determination of whether there was an express or implied contract between Harold Oshinsky (decedent) or other members of the putative class and Defendants, and whether there was a breach of any such contract."  Although Mr. Oshinsky drafted an affidavit prior to his death, which is referred to in this Opinion, it appears that Mr. Oshinsky's interest in the teams was waning because he had not attended a single Giants or Jets game since 2002.

Mr. Oshinsky's death has left some holes or voids in this case.  For instance, Mr. Oshinsky contends that he acquired his tickets from Cosmo Iacovazzi[6] about twenty-five years ago and that

---

[4]   There are numerous other terms in the PSL, including provisions relating to the sale of the PSL, indemnification, and forfeiture.

[5]   Although not at issue in this motion, the Estate is proposed as the class representative.  It appears, however, without opining, that the Estate's present interest falls short of the strict standard for class representative.

[6]   Mr. Iacovazzi was a very formidable football player at Princeton University and briefly had a professional football career, playing with the Jets for one season.

the implied contract extends from that time; however, since Mr. Iacovazzi died twenty years ago, there is no testimony from him about any implied contract. Without testimony from Mr. Iacovazzi, there is quite simply no way to determine if he agreed with Mr. Oshinsky's position that season ticket holders purchased the renewal right for all future years, so long as the season ticket holders paid for their season tickets annually.

In addition to Mr. Oshinsky's affidavit, Plaintiffs rely on the testimony of Jerry Fisher and Dr. Audry Weissman. Jerry Fisher, who is presently seventy-five years old, established season tickets with the Giants in 1959 for five mid-field seats. Mr. Fisher indicates that he "was led to, and did reasonably believe that beginning in 1959 the Giants and [he] had entered into an unwritten agreement" about his right to renew his season ticket subscription each year without major changes. Mr. Fisher believed that so long as he paid his season ticket fees, the Giants would provide the season tickets to home games and "permit [him] to retain ownership of [his] season ticket account" for as long as the Giants played in the New York metropolitan area.

Mr. Fisher alleges that the front side of the annual invoice constitutes the entire agreement between he and the Giants. According to Mr. Fisher, the front side of the invoice provides limited information – that is his name, address, account number, seat location, and the amount to be paid. In addition, the front side explained how to change incorrect information. Mr. Fisher states that he complied with those terms every year.

Mr. Fisher also noted that the back side of the invoice contained a "code of conduct," which regulated unruly behavior at the games, plus it contained a procedure by which season ticket holders could transfer their tickets to third parties, at any time in the future, regardless of other disclaimers. For example, Mr. Fisher alleges that the Giants allowed season ticket holders to transfer their tickets

4

to another family member; however, as explained below, the Giants and Jets required that such a transfer take place through a written process, and their agreement obtained.

Within his affidavit, Mr. Fisher does not rely on any written expression of renewal rights, but states that the policy was (1) communicated "by other season ticket holders who had been advised by the owners and/or officers of the Giants";[7] (2) contained in "blurbs" in newsletters; and (3) stated at games, during intermissions celebrating long time season ticket holders. Moreover, Mr. Fisher acknowledges that the back side of the invoice contained some limiting language that season tickets were "not transferrable" and "were subject to revocation"; but Mr. Fisher dismissed those conditions because he thought they "were simply left over boilerplate language," and were not a "clearly expressed reservations of rights." In other words, they were vague and arbitrary conditions.

Although the teams have both re-located to new home stadiums on several occasions during the past fifty years, Mr. Fisher posits that such moves did not effect his renewal rights. Thus, each time that the Giants or Jets moved to a new home stadium – e.g., the Giants from Yankee Stadium to the Yale Bowl and the Jets from Shea Stadium to Giants Stadium – the teams simply assigned each season ticket account the same number of seats in a comparable seat location. Mr. Fisher concludes that the same result should have occurred here.

Mr. Fisher also argues that the PSL is inequitable on account of his dedicated loyalty to the Giants from 1960 through 1980, when the Giants were performing poorly.[8] Mr. Fisher laments he

---

[7] The reliance of Mr. Fisher on the comments of "other season ticket holders" who are not identified gives rise to evidence issues. Without their testimony, Mr. Fisher's testimony of other fans' statements about the alleged renewal policy by Giants officials are hearsay, and non admissible. *See Shelton v. Univ. of Med. & Dentistry*, 223 F.3d 220, 226 n. 7 (3d Cir. 2000).

[8] Mr. Fisher's point has some historical merit. Over the eleven seasons between 1970 and 1980, the Giants' record was simply abysmal, including nine losing seasons.

> might have chosen to allow my account to be terminated for cause by simply ceasing to pay the annual fee, particularly during the twenty year period from the early 1960s to the early 1980s when I continued to maintain my account in good standing even while the Giants fielded horrible football teams year after year, eventually culminating with the game between the Giants and the Philadelphia Eagles that is despairingly referred to by Giants fans as "the Fumble" and happily referred to by Eagles fans as "the Miracle in the Meadowlands."[9]

Lastly, Mr. Fisher asserts that the PSL is a breach of an implied contract because the Giants have never previously discontinued season tickets without cause, and no cause for revocation was shown here.[10]

Dr. Weissman submits testimony similar to that of Mr. Fisher, but, unlike Mr. Fisher, she is both a Giants and Jets season ticket holder since 2008. Dr. Weissman's father was a season ticket holder for almost forty years before transferring his season tickets to his daughter. According to Dr. Weissman, her father acquired the Giants tickets from a business friend, Murray Packman. At some point in the 1980s, with the Giants' consent, her father became the recognized season ticket holder. It does not appear that there was a family relationship between Weissman and Packman. Dr. Weissman's father purchased the Jets season tickets directly from the Jets.

Dr. Weissman avers that both the Giants and the Jets had "established policies permitting the ownership of a season ticket to be transferred" by a season ticket holder to a "lineal family

---

[9] Mr. Fisher revives some ugly memories of "the Fumble" game. On November 18, 1978, the Giants were leading the Eagles (17-12), with only several seconds left in the game. With such little time left, all the fans expected quarterback Joe Pisarcik to take a knee after the snap. Instead, Pisarcik attempted a hand off to fullback Larry Csonka. Unbelievably, the ball was fumbled by Pisarcik, allowing Eagle cornerback Herman Edwards to recover the ball and run for a touchdown, giving the Eagles a victory. Ouch!

[10] It is curious that Mr. Fisher relies on the "without cause" language. Although no party precisely argues this, the construction of a $1.6 billion stadium without any public money may satisfy the "cause" provision for revoking alleged renewal rights.

member."[11]  According to Dr. Weissman, the unwritten terms of the agreement between herself and the Jets was that as long as the season tickets were purchased annually, she – the season ticket holder – retained renewal rights.  Hence, in Dr. Weissman's view, the termination of her contract through the PSL contract requirement, breaches the prior agreement.  Moreover, Dr. Weissman indicates that she never received any written or oral communication "resembling a clear notice" that the Giants and Jets could revoke season tickets without cause; nor does she rely on any written or oral representation.

Despite the Plaintiffs' argument that there was an unwritten contract preserving renewal rights into perpetuity, the Giants and Jets contend otherwise.

### B. Giants Defendants' Allegation that Renewal Rights were Never Conveyed to Plaintiffs

Presently, the New York Football Giants are owned and controlled by the Mara and Tisch families, and John Mara serves as chief executive officer.  Since 1925, the Giants have played their home games in five stadiums – the Polo Grounds (1925-1955), Yankees Stadium (1956-1973), the Yale Bowl in New Haven (1973-1974), Shea Stadium (1975), and Giants Stadium in East Rutherford (1976-2009). Throughout those years, the Giants have raised ticket prices annually, and have increased the number of preseason and regular season games for which tickets must be purchased by season ticket holders.

According to the Giants, there is no written evidence conferring or acknowledging that any renewal rights were conveyed to season ticket holders, including decedent.  In fact, Mr. Fisher confirms that from 1959 to 2008, a code of conduct was communicated to season ticket holders on

---

[11] In addition, long time season ticket holders were appreciated by being given priority for acquisition of playoff tickets or seat location changes.

the back of the annual invoice form. In addition, the Giants disclaimed all renewal rights on the back side of the invoice as follows:

> Renewal privilege is not transferable and if payment is made by another, no subscription privilege is thereby obtained by that other.
>
> Renewal privilege is extended at the option of the Giants and is subject to revocation at any time.[12]

According to John Gorman, ticket manager of the Giants, each individual ticket since 1973 has stated that it is a revocable license and that admission may be refused at the sole discretion of the Giants. In correspondence with season ticket holders over the years, the Giants have consistently stated that renewal rights over a long period of time do not exist because "the issuance of a ticket is a right and obligation of the Giants." The Giants have maintained that season tickets and renewal rights is a limited privilege, subject to revocation. That position was widely discussed and consistently maintained in the communications with season ticket holders. In one sample of an inquiry by a season ticket holder, the Giants expressed the following position:

> We are in receipt of your correspondence concerning transfer of season tickets. Please be advised that renewal privileges are not transferable. We are sorry but we are unable to comply with your request.

Sometimes season ticket holders would query whether their tickets could be transferred upon death as part of their estate plan. Generally, the Giants would not allow same. The Giants would respond as follows:

> We do not feel that subscribers have a property right to tickets, and are therefore not a proper item for disposition in a will.

---

[12] The Giants indicate that the revocation language commenced in the seventies. A copy of the Giants 2000 Season Ticket Invoice is attached to this Opinion as "Rider 1."

Although the season tickets were not transferable by will, the Giants would allow family members to transfer tickets to other family members, upon the condition that an application to the Giants was submitted and the Giants accepted the transfer. Upon submission of adequate proof, the Giants would "recognize family use of tickets," and would transfer season tickets to relatives. To effectuate a family transfer, the Giants required submission of either (a) a sworn statement of the season ticket holder consenting to the transfer request; (b) the death certificate of the season ticket holder of record and proof of the prospective subscriber's relationship to the deceased; (c) cancelled checks for five years as proof that the prospective subscriber in fact purchased the season tickets for the previous five football seasons; and/or (d) a notarized letter from the prospective subscriber that the season ticket holder is either deceased or his whereabouts are unknown to the prospective subscriber, and that the prospective subscriber agrees to relinquish any claim he has to the season ticket subscription if the season ticket holder of record, or a member of his family, makes a claim. Accordingly, the practice of the Giants, with respect to permitting the transfer of a season ticket to another member of the same family, was a substantive process and the transfer required the Giants' consent.

### C. Jets Defendants' Allegation that Renewal Rights were Never Conveyed to Plaintiffs

The Jets are owned by Woody Johnson. Their defense mirrors the Giants' argument. Since 1960, the Jets, previously known as the Titans, have issued season tickets. From 1960 until 2005, the Jets made no statement about renewal rights. In November 2005, the Jets communicated to season ticket holders that

> New York Jets season tickets are a series of revocable licenses to attend New York Jets games . . . and are revocable at the sole

> discretion of the New York Jets. The opportunity to renew season tickets . . . is a privilege that the New York Jets, in their sole discretion, generally offer each year to season ticket account holders who have complied with all of the terms and conditions applicable to their season tickets . . . .

The Jets did, however, communicate to season ticket holders on multiple occasions since 2001 that Jets tickets are revocable licenses. For example, in July 2001, the Jets communicated to season ticket holders via memorandum that "New York Jets game tickets are a renewable, revocable license. This gives the New York Jets the right to revoke season ticket privileges." Similarly, from 2001 to 2005, the back side of the Jets game tickets contained the following language:

> This ticket is a revocable license and may be revoked and admission refused at the sole discretion of the New York Jets LLC by refunding the printed price there-on. The New York Jets LLC reserves the right, without the refund of any portion of this ticket purchase price, to refuse admission or eject any person whose conduct is deemed by the New York Jets LLC to be disorderly or fails to comply with the terms and conditions contained herein.

The season ticket account change form (Change Form) sent to season ticket holders from 2005 through the 2008-09 season, also informed season ticket holders that

> NEW YORK JETS game tickets are revocable licenses. The New York Jets generally offer season ticket holders who have complied with all of the terms and conditions of their season tickets, including all payment terms and all codes of conduct applicable to stadium conduct, the opportunity to renew their season tickets.

According to the Jets, prior to announcing PSLs in August 2008, Mr. Oshinsky and Dr. Weissman never received any document discussing the transfer of any renewal right to them. Decedent agreed with that contention because he alleged that renewal rights "do not arise out of the explicit contractual terms of any single invoice or ticket stub, but rather from defendants' past collective course of conduct." However, Plaintiffs have not cited any specific document or oral statement by a Jets representative that sets forth any material terms underpinning their claims.

10

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact, and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgement. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in

favor of [the non-moving party], and making all credibility determinations in his favor – that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. Appx. 222, 227 (3d Cir. 2007).

### III. DISCUSSION

At the outset, *Oshinsky I* did not dismiss the issue of renewal rights because discovery was necessary to determine whether those alleged renewal rights had been established by the conduct of the parties. Therefore, in this Opinion we shall review the law of implied contracts and apply it to the alleged renewal rights in light of the summary judgment standard.

According to Mr. Fisher and Dr. Weissman, renewal rights never terminate, so long as the season ticket holder pays annually for season tickets and the season ticket holder does not engage in unruly conduct. As a matter of contract law, that is a suspect position because "[p]erpetual contractual performance is not favored in the law; and a construction affirming a right in perpetuity is to be avoided unless given in clear and peremptory terms." *W. Caldwell v. Caldwell*, 26 N.J. 9, 29 (1958) (citation omitted). Hence, the matter will be considered with this contract principle in mind: generally, "renewal rights can derive expressly from a written agreement or implied through a course of conduct." *Oshinsky I*, 2009 U.S. Dist. LEXIS 107608, at *14 ("An implied-in-fact contract is a true contract arising from mutual agreement and intent to promise, but where the agreement and promise have not been verbally expressed[, t]he agreement is inferred from the conduct of the parties."); *see also In re Penn Cent. Transp. Co.*, 831 F. 2d 1221, 1228-30 (3d Cir. 1987). Treatise writers have long agreed. Professor Williston states:

> Contracts may be express or implied. Just as assent may be manifested by words, so intention to make a promise may be manifested in language or by implication from other circumstances, including the parties' course of dealing or course of performance . . . . Thus an implied or in fact contract arises from mutual agreement and intent to promise, when the agreement and promise have simply not been expressed in words.

1 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 1:5 (4th ed. 2007 & Supp. 2010). Accordingly, it is often argued that a written contract may omit an essential term but the term must be enforced because it is evidenced by the parties actions. Generally, such actions are germane, but courts usually will not rewrite contracts for the parties unless literal construction will "frustrate the intention of the parties." 11 *id.* at § 31.7 (4th ed. 1999 & Supp. 2010). Professor Williston states:

> Questions relating to the propriety of considering the surrounding circumstances to determine the intent of the parties multiply as the complexity of industrial and commercial relationships increases, and the task of reconciling the many conflicting pronouncements of the law is virtually hopeless. Thus, while there are few rules of interpretation more firmly established or universally accepted than that the courts will not rewrite contracts for the parties, there are equally few courts that are constrained in that manner to the literal meaning of the words or the express provisions set forth in an instrument when it appears from the surrounding circumstances that a literal construction will defeat or frustrate the intentions of the parties.

*Id.*

In New Jersey, to determine whether an implied contract exists "depends on 'mutual agreement and intent to promise,'" established by objective proofs. *St. Barnabus Med. Ctr. v. Cty. of Essex*, 111 N.J. 67, 77 (1988) (quoting *W. Caldwell*, 26 N.J. at 29 and citing *St. Paul Fire &*

*Marine Ins. Co. v. Indem. Ins. Co.*, 32 N.J. 17, 24 (1960)). The clause "established by objective proofs" is significant because it requires that the "parties' actions be viewed by [a] reasonable person engaged in [a] relevant custom or trade." *Id.* (citing *St. Paul Fire*, 32 N.J. at 24). Hence, the impressions of the decedent, Dr. Weissman and Mr. Fisher are relevant but not absolutely controlling – the court must review whether an implied contract exists based upon reasonable person's observation. "Courts determine intent by asking what a reasonable person would think based on the extrinsic evidence and contract language . . . ." *In Re Nichels Midway Pier*, 348 Fed. Appx. 781, 782 (3d Cir. 2009) (citation omitted).

In the case of the Giants, no implied contract exists. Since 1959, on the back side of each annual invoice is a clause, which expressly curtailed renewal rights. It reads "[r]enewal privilege is extended at the option of the Giants, and is subject to revocation at any time." The intent of the Giants is crystal clear from this language.

Mr. Fisher alleges that the Giants abrogated that provision by their conduct; but his proofs of conduct are vague. First, he indicated that ongoing renewal rights were intended by the parties due to "blurbs" in Giants newsletters, but the content of the supposed "blurbs" were not produced. Second, he indicates that long time season ticket holders were recognized and congratulated during intermissions at games, thereby acknowledging that ongoing renewal rights were agreed upon. But, none of the statements made at such presentations were produced, hence it is amorphous whether Mr. Fisher's statement is true. Third, Mr. Fisher alleges that the Giants always allowed transfer of season tickets to family members, which he argues proves the intent of the parties to agreed upon ongoing renewal rights. Although the Giants agreed that it allowed family related transfers, it was through a detailed process, which required a written application and Giant's acceptance. No

14

reasonable person would conclude that the Giants intended to irrevocably offer renewal rights based on Mr. Fisher's proofs.

The Jets case is different from that of the Giants. Whereas the Giants gave written notice of revocability of season tickets from 1959 forward, the Jets first annunciation occurred in 2005. The Jets contend it was always their "long standing policy" that the team could revoke season tickets whenever it desired. Dr. Audry Weissman disagrees. She argues that the Jets Change Form advised that the Jets had established policies permitting "transfers to third parties," especially to lineal family members. However, the Change Form does not comport with her characterization. Immediately before the signature line on the Change Form, there is a substantive clause that notes that Jets season "tickets are revocable licenses . . . [and] the Jets reserve the right to refuse to approve any proposed transfer." The Change Form clause states:

> New York Jets game tickets are revocable licenses. The New York Jets generally offer season ticket holders who have complied with all of the terms and conditions of their season tickets, including all payment terms and all codes of conduct applicable to stadium conduct, the opportunity to renew their season tickets. The New York Jets reserve the right to refuse to approve any proposed transfer of a season ticket account in its sole discretion. No transfer may be made for any payment or other consideration. Any transfer made without the approval of the New York Jets or in violation of the preceding sentence shall be void and may result in the revocation of the season ticket account.

There is nothing in Dr. Weissman's affidavit from which a reasonable person would conclude that the Giants and/or Jets transferred renewal rights to season ticket holders. A reasonable person would not conclude there was an agreement.

In support of Plaintiffs' contention that an implied covenant existed, they argue that the contract was "vague and ambiguous." As part of the same argument, the conspicuousness of the

15

revocation clause is raised.  That is, the Plaintiff's contend that the revocation language in the invoice was also "vague and ambiguous."  Plaintiffs argue the issue is "whether a purported written disclaimer is so clear and conspicuous as to bar a finding of an implied contract as a matter of law."  The Plaintiffs are mixing two principles.  A contract is ambiguous if a genuine doubt appears as to its meaning.  11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 30.4 (4th ed. 2007 & Supp. 2010).  On the other hand, "a term or clause is conspicuous if it is written in a way that a reasonable person against whom it is to operate ought to notice it."  Black's Law Dictionary 304 (7th ed. 1999).  With regard to the latter – conspicuousness – the revocation language on the season ticket invoice is clearly placed.  (*See* rear side of invoice attached as Rider 1).  Although Mr. Fisher indicated that he thought the revocation was "boilerplate" language, his conclusion recognizes that he saw it, and it is contrary to what an objective reasonable person would determine by reading the document.

With regard to ambiguity, the court has reviewed the invoices and all the extrinsic evidence about the conduct of the parties to determine whether there was any implied contract.  As such, the teams never promised renewal rights in perpetuity to the season ticket holders, and there is no conduct which undermines same.  Hence, the "ambiguity and vague" argument is meritless.

Mr. Fisher, in his affidavit, has raised an issue which some other courts have analyzed as a breach of the covenant of good faith.  He argues that he endured twenty years, during the 1960s and 1970s, of "horrible football teams year after year," and a recurring nightmare of the fumble game.  His argument is – why would anyone buy season tickets during those years unless the season ticket holder believed his season tickets were renewable in hope of a good season to follow? This argument has been addressed in a similar setting.  In another football case, a court ruled the argument "was out

of bounds." *Charpentier v. Los Angeles Rams*, 75 Cal. App. 4th 301, 314 (Cal. Ct. App. 1999). Good faith "prevents a contracting party from engaging in conduct that frustrates the other party's rights." *Id.* (citation omitted). As the California court noted, the "plaintiff did not buy the right to watch a good team"; " nor was the team required to repay local fans' loyalty by declining other opportunities." *Id.* Similarly, the Seventh Circuit noted, even if "the Chicago Cubs turn out to be the doormat of the National League[, that] would not entitle the ticket holder to a refund for the remaining games, any more than the star tenor's laryngitis entitles the opera goer to a refund when the understudy takes over the role." *Seko Air Freight, Inc. v. Transworld Sys., Inc.*, 22 F.3d 773, 774 (7th Cir. 1994). The same holds here, there was no covenant to field play-off bound teams each year and there is no reason for the teams to decline opportunities. In short, Mr. Fisher's contention is appealing, but not persuasive.

      Lastly, there is a single point about ticket prices which is worth recounting. "A license fee is just an add-on to the price," albeit a substantial add-on in this case. However, the "price is set by the purveyor of the entertainment and is controlled by market forces, not the courts." *Charpentier*, 75 Cal. App. 4th at 308. Here, the Giants and the Jets as purveyors of the season tickets have substantially raised the cost of tickets every year without any substantial objection. It is their responsibility to oversee ticket prices and PSL contracts, not the courts, absent a breach of an agreement.

      Summary judgment may be granted if no reasonable jury could find for Plaintiffs. *Alevras*, 222 Fed. Appx at 227. This is such a case. There is no conduct of the Jets and Giants that could be interpreted as conveying renewal rights to season ticket holders.

### IV. CONCLUSION

Defendants' motion for summary judgment is granted. This case is hereby dismissed with prejudice.

*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.

February 2, 2011

.

# RIDER 1

**2000 SEASON TICKET INVOICE**

**GIANTS**
Giants Stadium
East Rutherford, NJ 07073
(201) 935-8222

Invoice Date: March 2000

**TELEPHONE NUMBERS**
Day:                        Fax:
Evening: (201) 797-3641     Email:



New Account No: 258257

Clifton, NJ 07014

In order to serve you better it is important that we have your correct information on file. Please make all changes on the back of the return portion if your address has changed, or if the telephone numbers shown are incorrect.

## SEATING INFORMATION

| EVENT | SECTION | ROW | SEATS | # SEATS | UNIT PRICE | TOTAL COST |
|-------|---------|-----|-------|---------|------------|------------|
| 00FS  | 335     | 14  | 26-28 | 3       | $450.00    | $1,350.00  |
| 00FS  | 335     | 15  | 26-28 | 3       | $450.00    | $1,350.00  |

**PAYMENT DUE BY MAY 10, 2000**

**BILLING SUMMARY**
Postage and Handling        $4.00
Total Charges               $0.00
Less Payments/Credits (-)   $0.00

**TOTAL AMOUNT DUE        $2,704.00**

Please return this portion with your remittance.



**2000 SEASON TICKET INVOICE**

For Address Correction, please check this box and make changes on back.

New Account No: 258257

NEW YORK FOOTBALL GIANTS
NEWARK POST OFFICE
P.O. BOX 10733
Newark, NJ 07193-0733

Clifton, NJ 07014

**GIANTS**
Giants Stadium
East Rutherford, NJ 07073
(201) 935-8222

PLEASE RECORD YOUR NEW ACCOUNT NUMBER ON YOUR CHECK AND MAKE ALL CHECKS PAYABLE TO: GIANTS

New Account No. 258257

Total Amount Due by 5-10-00    $2,704.00

Amount Enclosed  $2704.00

0002582571   0002704007   0002704007   0000136460

GIANTS 000098



# TO PROTECT YOUR SUBSCRIPTION
## INVOICE MUST BE RETURNED WITH PAYMENT ON OR BEFORE MAY 1ST

The due date for renewal of all subscriptions is May 1st. Privilege of renewal for the coming season is extended only to the subscriber on the front of this bill. The resale of tickets for a price in excess of their face value is strictly prohibited, and any violation of this policy will result in the revocation of the season subscription. The subscriber of record is responsible for the tickets assigned to his or her account. If the person using the tickets engages in inappropriate behavior, the season subscription may be revoked.

The name that appears on the top line of the address portion on the face of this bill is our subscriber of record-No one else is the subscriber.

Where our subscriber is actually a company or corporation the subscription should be listed in the company name (first line) to the attention of a designated employee (second line).

Renewal privilege is not transferable and if payment is made by another, no subscription privilege is thereby obtained by that other.

Renewal privilege is extended at the option of the Giants and is subject to revocation at any time.
F.E.I.N. #13-1098180  FOOTBALL GIANTS, GIANTS STADIUM, EAST RUTHERFORD, NJ 07073

### 2000 GIANTS OPPONENTS
(The National Football League will release dates and times in April)

| PRESEASON | | REGULAR SEASON | |
|---|---|---|---|
| **Home** | **Away** | **Home** | **Away** |
| Chicago | Jacksonville | Arizona | Arizona |
| Baltimore | Jets | Dallas | Dallas |
| | | Philadelphia | Philadelphia |
| | | Washington | Washington |
| | | Detroit | Atlanta |
| | | St. Louis | Chicago |
| | | Jacksonville | Cleveland |
| | | Pittsburgh | Tennessee |

MAY -1 2000

### ADDRESS CHANGE

ALL CHANGES FOR ACCOUNTS WITH COMPANY OWNERSHIP MUST BE SUBMITTED IN WRITING ON COMPANY LETTERHEAD BY AN OFFICER OR MANAGER. NO NAME CHANGES ON ANY ACCOUNT WILL BE ALLOWED.



ACCOUNT NO.
COMPANY (IF
NAME
ADDRESS
CITY, STATE, Z
PHONE (WORK
SIGNATURE

GIANTS 000099